RENDERED: AUGUST 1, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0373-MR

DAMOU BRADLEY                                                            APPELLANT

APPEAL FROM SCOTT CIRCUIT COURT
v.       HONORABLE JEREMY MICHAEL MATTOX, JUDGE
ACTION NO. 20-CR-00080

COMMONWEALTH OF KENTUCKY                                      APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: COMBS, L. JONES, AND TAYLOR, JUDGES.

COMBS, JUDGE: Appellant, Damou Bradley (Bradley), was tried and convicted of second-degree assault and attempted murder following a bench trial. He was sentenced to twenty years in prison. The judgment was affirmed on direct appeal in *Bradley v. Commonwealth*, No. 2021-SC-0113-MR, 2022 WL 3641189 (Ky. Aug. 18, 2022). Bradley, *pro se*, now appeals from an Order of the Scott Circuit

Court denying both his RCr[1] 11.42 motion to vacate alleging ineffective assistance of counsel and his request for an evidentiary hearing. After our review, we affirm.

*Bradley*, *supra*, provides a summary of the underlying facts as follows in relevant part:

> Bradley and the victim, D.B., met through a dating website in August 2016. . . . In October 2016, their relationship became sexual. However, in late January 2017, Bradley and D.B. decided to only be friends and continued to spend time together. . . .
>
> On . . . May 13, 2017, D.B. went to work. . . . Bradley texted her stating that he stole her credit card information and also making unusual statements about faith as well as comments about being Jesus. That afternoon D.B. received an unsettling phone call from her close friend, Nate, who was in the process of moving in with her. Nate was at D.B.'s apartment putting furniture together for his upcoming move. Bradley was also there. During Nate's phone call to D.B., Nate seemed afraid and alerted D.B. that Bradley attempted to attack and stab him. Nate was able to run out of the house when the attempted attack occurred.
>
> Concerned . . . D.B. left work and drove straight home. Upon arriving, D.B. asked Bradley what happened. Bradley was evasive . . . . D.B. . . . became afraid, recognizing the situation was strange . . . . Eventually, Bradley appeared to calm down and their conversation became normal. To continue her usual routine, D.B. decided to take a shower.
>
> Realizing her soap and shampoo were not in the shower where she left them, D.B. called out to Bradley

[1] Kentucky Rules of Civil Procedure.

-2-

to bring her the items.[2]  At first, Bradley was apprehensive to enter the bathroom and simply set the bottles on the sink.  However, he then asked if he could get in the shower with her, which she found odd because they had never showered together before.  While apprehensive, she acquiesced to keep him calm.  Shortly after entering the shower Bradley stated he had to use the restroom and left.  When he got back into the shower, he kissed D.B. aggressively and asked her to perform oral sex.  She told him she did not want to, but he insisted so she acquiesced.

After D.B. performed oral sex for approximately one minute, Bradley grabbed her hair and shoved her head down, choking her. Bradley . . . shoved her down onto the bathtub floor and began punching her . . . . [S]he tried . . . to get free. Bradley . . . flipped her over and put one hand around her neck.  D.B. felt a jab in her side and . . . she saw Bradley's knife in his hand and realized he brought it into the shower. . . .

After stabbing D.B. in her side, Bradley stabbed her on the left side of her neck around her collarbone, then in the front of her neck, and finally on the back, right side of her neck.  After the final stab, Bradley sat the knife on the edge of the bathtub and D.B. flung it away.  Bradley grabbed D.B.'s neck with both hands and applied "incredible force" as he strangled her.  Despite her efforts she could not get away from him.  She could not breathe and testified that within 30 to 45 seconds she passed out.

. . .

---

[2] Here, in a footnote, the Court explained that "D.B. testified that the missing shampoo and soap was odd because she did not remove those items from her shower.  The insinuation was that Bradley removed the items from the shower as part of his planned attack on D.B.  In the final judgment, the trial court referenced Bradley's "staging" of the shower by removing the toiletries." *Id.* at *1, n.2.

-3-

D.B. testified that as she regained consciousness, she had difficulty breathing. She had toilet paper shoved in her mouth and black shorts were wrapped around her neck. . . .

She heard Bradley come upstairs. He entered the bathroom and turned on the light. According to D.B., he opened the shower curtain and exclaimed, "Oh my god, you're alive? That should have killed you . . . I watched you die, and you're back." She was still at the bottom of the bathtub and struggling to breathe. D.B. realized she was covered in blood. Bradley offered to clean D.B. up and they proceeded to the other bathroom in the apartment. Bradley restated that God told him to kill her, and again proclaimed that he watched D.B. die and called her a sacrifice. Bradley then inexplicably started calling D.B. God. D.B. eventually convinced Bradley to call 911.

Bradley called 911 and admitted to the operator that he stabbed his girlfriend. . . . Police officers arrived and paramedics began treating D.B.

. . .

After police read Bradley his rights, they questioned him. Bradley told an officer multiple times that he stabbed and choked D.B. When asked for an explanation, Bradley explained that he had been thinking about harming D.B. for about a week, and that it was a big decision because he had never taken a life before. Bradley explained that God instructed him to do it as a test of his faith. In the videotaped police interview, which was admitted as a trial exhibit, Bradley stated that he attacked D.B. with his knife, confirmed that he stabbed her first, then choked her, and stated "it's not like I even stabbed her hard, I just stabbed her."

During a search of the apartment police found the knife Bradley used to stab D.B. . . . . Forensic testing

-4-

confirmed the presence of both Bradley's and D.B.'s DNA on the knife and D.B.'s testimony also confirmed that it was the knife used to stab her. Police also found Bradley's backpack, which contained bleach, peroxide, a trash bag, black Gorilla tape, clothes, and a sock full of coins that was tied up at the end. . . .

A bench trial began on November 16, 2020. At trial, Bradley's defense was that D.B. stabbed herself. Bradley asserted that D.B. concocted a plan for Bradley to take the blame by claiming that he suffered from a paranoid-schizophrenic delusion that God told him to kill her. Bradley also claimed that D.B. was upset because he had recently rejected her request to be in an exclusive relationship. Ultimately, the trial court found Bradley guilty of both second-degree assault and attempted murder and sentenced him to twenty years in prison.

*Id.* at *1-3 (footnotes omitted).

On direct appeal, Bradley argued that the trial court erred in denying his motions for directed verdict. The Supreme Court noted that since it was a bench trial, the trial court should have treated Bradley's motions as motions to dismiss under CR 41.02(2), which provides that:

In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52.01.

-5-

However, Bradley was not entitled to dismissal under that rule. "[A]lthough Bradley used the wrong procedural method at trial, it has no bearing on our ultimate resolution of this issue given the overwhelming evidence against Bradley." *Id.* at *4. Our Supreme Court explained as follows:

> The trial court concluded that Bradley had the requisite intent to cause the death of D.B. The trial court cited extensive evidence to support this conclusion, including: (1) Bradley's admissions to the 911 operator and law enforcement; (2) D.B.'s testimony regarding the attack, namely that when she asked Bradley what he was doing, he replied, "God told me to kill you"; Bradley stuffing toilet paper in her mouth and wrapping her shorts around her neck, and him stating "that should have killed you . . . I watched you die"; (3) the medical evidence concluding D.B. was choked, sustained bruising, and lost consciousness; (4) Bradley's text messages to D.B. earlier on the day of the attack that included stating, "Im jesus Christ and I never knew how this really felt to know the truth of manifestation," and stating he was "ready for [his] next phase already im ok with what has to happen in my life," messages the trial court believed indicated Bradley's plan to blame the attack on God; (5) the items Bradley brought to D.B.'s residence in his backpack, which included bleach, a trash bag, a sock with lots of coins inside and tied at one end, a roll of Gorilla tape, and a change of clothes; and (6) Bradley's explanation to police that he contemplated the attack for a week and that it was a big decision because he had never taken a life before.
>
> The trial court clearly weighed and evaluated the evidence presented. That evidence was sufficient to meet the Commonwealth's burden. Although in denying Bradley's motion for directed verdict the trial court announced that it viewed the evidence in the light most favorable to the Commonwealth, the evidence against Bradley was overwhelming without regard to how it was

-6-

viewed, i.e., even without viewing it in the "light most favorable to the Commonwealth" the result was inescapable. As such, Bradley was not entitled to dismissal under CR 41.02(2) and the trial court did not abuse its discretion.

*Id.* at \*4–5 (citation omitted).

On direct appeal, Bradley also argued that the trial court erred in admitting D.B.'s statements regarding Bradley's unrelated criminal activity or bad acts -- *i.e.*, that he stole her credit card information and "sexually assaulted her in the shower by choking her on his penis." *Id.* at \*5. Our Supreme Court disagreed. The Court discussed the test for assessing admissibility of evidence of other bad acts under KRE[3] 404(b) and concluded that the evidence of "Bradley's 'other acts' was relevant, probative, and not unfairly prejudicial. As such, the testimony was admissible and no error occurred." *Id.* at \*6.

On March 29, 2023, Bradley filed a motion pursuant to RCr[4] 11.42 to vacate judgment and sentence due to ineffective assistance of counsel and a motion for an evidentiary hearing. On December 8, 2023, Bradley filed a motion to supplement his RCr 11.42 motion.

On February 20, 2024, the circuit court entered an Order denying Bradley's request for an evidentiary hearing as well as his RCr 11.42 motion,

---

[3] Kentucky Rules of Evidence.

[4] Kentucky Rules of Criminal Procedure.

which we discuss further in our analysis below.  In its conclusion, the trial court

stated as follows:

> Against counsel's advice, Movant requested a
> bench trial, waiving his right to a jury trial.  Movant
> repeatedly ignored the advice of his own counsel during
> this matter and now laughably seeks to set aside the
> judgment based upon said counsel's ineffectiveness.
> There is no issue that the Movant has raised in his
> motions and memoranda that cannot be disposed of by a
> review of the Court's record, thus an evidentiary hearing
> is not necessary.  The Movant demanded a waiver of his
> right to a trial by jury against the advice of his counsel
> wherein he then knowingly waived his right against self-
> incrimination and elected to testify.  Upon an unfavorable
> verdict the Movant filed a direct appeal which was
> denied.  There is no credible basis for this motion and it
> is clear that the Movant has a great deal of buyer's
> remorse at his own waiver of his constitutionally
> afforded protections.

Bradley appealed.  In reviewing his appeal, we note at the threshold:

> The standard by which we measure ineffective
> assistance of counsel is found in *Strickland v.*
> *Washington*, [466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d
> 674 (1984)].  A claim of ineffective assistance of counsel
> requires a showing that counsel's performance fell below
> an objective standard of reasonableness, and was so
> prejudicial that the defendant has been deprived of a fair
> trial and reasonable result.  Counsel is constitutionally
> ineffective only if performance below professional
> standards caused the defendant to lose what he otherwise
> would probably have won.
>
> . . .

There is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance.

*Commonwealth v. Bussell*, 226 S.W.3d 96, 103 (Ky. 2007) (internal quotation marks and footnotes omitted).

"An evidentiary hearing under RCr 11.42(5) is required only when there is a material issue of fact that cannot be determined on the face of the record." *Commonwealth v. Searight*, 423 S.W.3d 226, 231 (Ky. 2014) (internal quotation marks and footnote omitted). Where, as here, "no evidentiary hearing was held . . . our review is limited to determining whether the motion on its face states grounds that are not conclusively refuted by the record and which, if true, would invalidate the conviction." *Id.* (internal quotation marks and footnote omitted).

ARGUMENTS

I.

Bradley's first argument on appeal is that he was denied effective assistance of when defense counsel failed to file a motion to suppress his statements to police. The circuit court found no deficiency in counsel's performance, "especially in light of the fact that there was no obvious basis upon which to bring the motion." The court explained that the video record of the out-

of-court statements clearly showed that Bradley was properly Mirandized;[5] that Bradley had made hundreds of phone calls while incarcerated with no expectation of privacy and with explicit notice that the calls were being recorded; that defense counsel had properly probed Bradley's mental status at the time of the incidents and at the time of the statements; and that a competency evaluation was completed and stipulated to by the parties. The court further noted that Bradley had insisted on testifying at trial against counsel's advice, thus waiving his right not to incriminate himself under the Fifth Amendment of the United States Constitution. The circuit court did not err in denying Bradley's RCr 11.42 motion with respect to counsel's alleged failure to file a motion to suppress. Even if the allegations in the motion were true, the overwhelming evidence of Bradley's guilt would not succeed in invalidating the conviction.

## II.

Next, Bradley contends that he was "denied effective assistance of counsel when defense counsel failed to inform him of expert evidence and provide timely notice to introduce his mental illness or mental condition on the issue of guilt, punishment or lesser-included offenses."

Again, the circuit court noted that a competency evaluation was completed and that competency was stipulated; that Bradley had elected to testify

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

at trial **against** his counsel's advice, presenting a wholly different defense to the case than one of any diminished mental capacity or mental state at the time of the incident; and that defense counsel had properly explored Bradley's mental status. The court stated that "[i]t is clear from the record in this matter that there is nothing related to this issue that would rise to the level of ineffective assistance of counsel as contemplated in *Strickland*."

At ¶¶ 6-7 of his RCr 11.42 motion, Bradley stated that "counsel failed to inform him of . . . Dr. Eric Y. Drogin's reports of him [*sic*] being intoxicated to the degree that movant did not know what he was doing on the night in question, which negates the element of Intent for the Attempted Murder and Second degree Assault charges." Bradley further stated that he eventually reached out to Dr. Drogin, who "responded that he would have testified to the facts of the letters that indicated that [Bradley] was under an intoxication that resulted in him [*sic*] not being aware of his actions to negate the element of intent."

As the Commonwealth notes in its brief, Dr. Drogin stated in a letter to defense counsel that "in the course of examinations conducted in May and June 2017 it was difficult -- for reasons that were never fully clear -- to obtain your client's valid participation." Further, that "[i]t was not possible, given difficulties in interpreting the overall data set, to arrive at a definitive conclusion about the role acute mental illness may have played in this case." Dr. Drogin did indicate that

with "the additional benefit of a follow-up examination -- one in which, with any luck, your client will find himself in a position to communicate effectively -- it may now be possible to arrive at supportable professional opinions on the potential viability of a criminal responsibility defense . . . ." (emphasis added).

Dr. Drogin offered nothing more than speculation. We agree with the Commonwealth that the record refutes Bradley's claim; we also agree that the circuit court properly denied the motion.

### III.

Bradley's third argument is that he "was denied effective assistance of counsel due to trial counsel failing to hold the prosecution to adversarial testing process concerning the attempted murder charge by choking the victim to unconsciousness." The circuit court determined that:

> Counsel for the Movant properly cross-examined the witnesses as it related to the choking and made relevant objections to testimony in court. The victim testified in great detail as to the circumstances of the incident and the Court found the testimony highly credible. This was not a case that was heavily reliant upon an expert report or opinion to find the Movant guilty. Failing to present an expert to rebut the overwhelming direct evidence against the Movant again does not rise to ineffective assistance of counsel.

We agree with this analysis, and we find no error.

-12-

IV.

Bradley's fourth argument is that he "was denied effective counsel on numerous occasions when trial counsel failed to object and request relief to preserve issues. Cumulative effect."

> In an RCr 11.42 proceeding, the movant cannot raise issues which were raised and decided on direct appeal. . . . [T]he law of the case doctrine prevents review of issues raised in the direct appeal. It is not the purpose of RCr 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceeding, nor those that were raised in the trial court and upon appeal considered by this court.

*Wilson v. Commonwealth*, 975 S.W.2d 901, 903–04 (Ky. 1998) (internal quotation marks and citations omitted). The issues which Bradley raises in this argument are inappropriate for RCr 11.42 relief because they could have been raised on direct appeal, or they were raised and rejected on direct appeal, or they are without merit. We do not consider them. We also reject Bradley's claim of cumulative error.

V.

Bradley's fifth argument is that he "was denied effective assistance of counsel due to trial counsel failing to impeach key witnesses at trial to destroy credibility, prevent perjury, present defense." As the Commonwealth explains, this argument focuses on the alleged failure of defense counsel to impeach the victim's testimony about Bradley's asking D.B. for oral sex, grabbing her by the hair, choking her on his genitals, and being scared. Even if those allegations were true,

-13-

they would not be sufficient to invalidate the conviction given the overwhelming evidence against Bradley.

## VI.

Bradley's sixth argument is that he was denied effective assistance of counsel when counsel failed to investigate, subpoena, or call officers Melton and Slone to testify. Bradley suggests that they would have testified differently about the order of the stabbing and strangling. The circuit court found that "nothing in the evidence or the trial record . . . support[ed] such an assertion." It is well settled that "RCr 11.42 motions are not intended to conduct further discovery or fishing expeditions. . . . [V]ague allegations, including those of failure to investigate, do not warrant an evidentiary hearing and warrant summary dismissal of the RCr 11.42 motion." *Prescott v. Commonwealth*, 572 S.W.3d 913, 926 (Ky. App. 2019) (internal quotation marks and citation omitted).

## VII.

Bradley's seventh argument -- that defense counsel was ineffective when he "failed to make a Motion to Dismiss pursuant to CR 41.02(2) instead of a Motion for Directed Verdict" -- lacks merit. On direct appeal, our Supreme Court determined that Bradley was not entitled to relief under CR 41.02(2) as discussed above. That determination is the law of the case. *Wilson*, *supra*, at 904.

VIII.

For his eighth argument, Bradley contends that defense counsel was ineffective when it failed to request the trial court to consider extreme emotional disturbance (EED).

We find no error. The trial court specifically considered EED -- *and categorically rejected it*. At page 8 of its Findings of Fact & Conclusions of Law entered November 18, 2020, following the bench trial, the court found as follows:

> Defendant set out in a deliberate manner to attack, subdue, and kill [D.B.] This is supported by overwhelming evidence to include the testimony of [D.B.], prior statements by the Defendant, the "staging" of the shower by removing toiletries, and the bag of cleanup supplies Defendant brought with him to [D.B.'s] home. **This was not done in a fit of rage or state of extreme emotional disturbance and there is no evidence to support that it was anything but a planned, willful attack**.

IX.

Bradley's ninth argument is that he was denied effective assistance of counsel when defense counsel (1) failed to inform him and "completely hire" a Dr. Taub and (2) failed to submit video footage, which he claims showed (a) the victim walking out from her residence and (b) that evidence was planted at the scene and was moved around. Bradley states that he learned about Dr. Taub when he made an Open Records request to the Finance and Administration Cabinet and received a

response documenting a payment to Medical Reviewing Consulting LLC for Bradley.

We agree with the Commonwealth that these claims are vague and conclusory and that they fail to demonstrate prejudice, which Bradley cannot show, given the overwhelming evidence against him. *Seabright*, *supra*, at 228.

X.

Bradley's final argument is that the circuit court erred in failing to hold an evidentiary hearing. For the reasons discussed above, we do not agree that the trial court erred in denying the request for an evidentiary hearing.

Accordingly, we affirm.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Damou Bradley, *pro se*
West Liberty, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General
Frankfort, Kentucky